𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

## The Hagan Company, Inc., and Charles F. Hagan, Trustee, and in His Own Right v. Norton Coal Company.

September 20, 1923.

1. Mines and Minerals—*Leases—Cloud on Title—Injunction by Lessee Against Sale of Surface by Lessors—Case at Bar.*—The lessee under a mining lease sought to enjoin the sale by the lessors of various parcels of the surface of the land covered by the lease, on the ground that the execution and delivery of the deeds of conveyance to the purchasers of these parcels would create a cloud upon the lessee's title or right to the use of the surface of, and other things on, the land embraced in the lease. The evidence showed that the lessee was at the time of the institution of the suit for injunction entitled to the use of all of the surface of and also to the use of the timber and the sand, stone and water, at and from the time suit was brought until the operations of the lessee were completed, which might continue for forty years. The proposed deeds to the purchasers of the surface would have been understood by the grantees as conveying to them a present right and title to the surface of the land, and to the timber, etc., appurtenant thereto, subject to be terminated, not at once, but at some future time, by the coming into and during the existence of the right of the lessee to such surface. On their face this would have been the proper construction of such deeds, and the natural result of such deeds would have been the taking and retention of possession by the grantees, unless prevented by litigation.

   *Held:* That the deeds would have created a cloud upon the title or right of the lessee.

2. Mines and Minerals—*Leases—Cloud on Title—Injunction by Lessee Against Sale of Surface by Lessors—Case at Bar.*—Deeds by lessors of minerals, not void on their face, but apparently valid to convey a present right and title to the surface of the land to the use of which under the lease the lessee was entitled, would require extrinsic evidence in the future, other than the mere production of the leases referred to in the deeds, to prevent the operation of the deeds; that is to say, the production, in separate actions or suits

against the several grantees, of extrinsic evidence, showing that the lessee, at the time such deeds were made, held, under the leases, the prior right and title to the use of the surface.

*Held:* That such deeds would create a cloud on the title of the lessee.

3. MINES AND MINERALS—*Leases—Cloud on Title—Injunction by Lessee Against Sale of Surface by Lessors—Multiplicity of Suits.*—A court of equity has jurisdiction to enjoin the sale by the lessors of any of the surface of land covered by a mining lease, when the lessee is entitled to the present use of all of the surface, for the purpose of preventing a threatened cloud upon the lessee's right and title thereto, or for the purpose of preventing the lessors from violating the covenants of the leases, or to prevent a multiplicity of suits.

4. CLOUD ON TITLE—*Jurisdiction—Injunction—Threatened Cloud.*—As a court of chancery may undoubtedly entertain a suit to remove an existing cloud upon a title, so also it may, in a proper case, interpose its authority to prevent, by injunction, a threatened act from which such a cloud must necessarily arise. In such cases, however, "the danger must be imminent and not merely speculative or potential."

5. MINES AND MINERALS—*Mining Lease—Use of Surface by Lessee when "Necessary or Convenient"—Case at Bar.*—In the instant case, a suit by lessee in a mining lease to enjoin a sale in parcels of the surface of the subject of the lease, it appeared that the lessee was entitled to the use of the surface when "necessary or convenient" for the purposes mentioned in the lease. The lessors claimed that at the time the suit was instituted, the lessee was not entitled to the use of all of the surface of the land, because the same was not needed and never would be needed for the operation of the mines.

*Held:* That the evidence was sufficient to show that the time had arrived, when the suit was instituted, when much of the surface of the land was "necessary or convenient" for mining purposes.

6. MINES AND MINERALS—*Mining Lease—Right of Lessee to Use so Much of the Surface as may be Necessary or Convenient.*—A mining lease provided that the lessee should have the right to the use of so much of the surface of the land as might be necessary or convenient for mining or coking coal and for the construction of buildings, roads, etc. It was contended by the lessors that the lessee was not entitled to any of the surface until actually needed for mining purposes.

*Held:* That this construction would unduly restrict the meaning of the term "necessary or convenient."

7. WORDS AND PHRASES—*"Convenient."*—"Convenient" is defined as meaning fit, or adapted to an end; suitable; appropriate.

8. MINES AND MINERALS—*Mining Lease—Use of Surface when Necessary or Convenient.*—Under a mining lease the lessee was entitled to use the surface when "necessary or convenient" for mining, etc. "Necessary or convenient" is less restrictive in meaning, than if the single word "necessary" had been employed. The context in which the

word "convenient" is found limits its meaning so that it cannot be properly construed to embrace every use for which the surface may at any time in the future be convenient; but it does embrace every use for which the surface, etc., was convenient at the time and would be reasonably necessary in the immediate future, in order to carry into execution plans of the lessee already actually made and in process of execution.

9. MINES AND MINERALS—*Leases—Cloud on Title—Injunction by Lessee Against Sale of Surface by Lessors—Case at Bar.*—A mining lease provided that the lessee should have the right to the use of so much of the surface of the land as might be necessary or convenient for mining or coking coal and the construction and repairing of buildings, roads, etc. The evidence showed that it was uncertain and speculative whether the use of the surface of the lands involved in the instant suit would ever be "necessary or convenient" for mining or coking operations.

*Held:* That until the surface was "necessary or convenient" for mining purposes, the lessors were entitled to such use of the surface as might not, if terminated for the time being when the rights of the lessee accrue, affect the latter rights; and the lessors might lawfully sell and convey such rights.

10. MINES AND MINERALS—*Mining Lease—Sale of Surface by Lessors—Remedies of Lessee.*—Where the lessee in a mining lease was entitled to the use of the surface when necessary or convenient for mining purposes, and the lessors before the arrival of such time sold the surface in various parcels, upon the accrual of the rights of the lessee, and while they existed, the jurisdiction of equity to remove an existing cloud upon the lessee's title, or for preventing the violation of covenants of the leases, or for preventing multiplicity of suits, or disturbance of existing easements, would afford the lessee ample remedy in one suit against all of the grantees of the surface of the lands.

11. MINES AND MINERALS—*Mining Lease—Enjoining Proposed Sale by Lessors of Minerals—Case at Bar.*—In the instant case, an action by the lessee in a mining lease to enjoin sales of the surface and minerals by the lessors, the record was obscure with respect to what kind of sales and conveyances were threatened to be made of the "mineral" underlying the land. If, as appeared, the sale of the mineral underlying the land would have been a sale of the coal underlying it, which belonged to the lessee, such sale would have been a violation of the lease. If it was proposed to sell and convey to the purchasers of the respective parcels of land, as appurtenant thereto, separate interests in the rental and royalty return of the lessors, that too would have violated the provisions of the lease, which, in effect, rendered such rights of the lessors incapable of division. Only the whole or definite undivided interests in such

rights of the lessors, to be enjoyed and exercised in common, were capable of being sold. However, the lessors were entitled to present and future rights or interests under the lease, such, for example, as the right to receive the rent or royalty accruing, and they had the right to sell and transfer the whole or definite undivided shares of such interests, to be enjoyed by the purchaser or purchasers during the life of the lease.

12. APPEAL AND ERROR—*Final Decree by Appellate Court—Case at Bar.*—In the instant case, a suit to enjoin the threatened sale by the lessors in a mining lease of the surface and minerals to various persons, the decree of the lower court was in part erroneous, and therefore the Supreme Court of Appeals reversed the decree and rendered a decree correcting such erroneous part under section 6365 of the Code of 1919.

Appeal from a decree of the Circuit Court of Wise county. Decree for complainant. Defendants appeal.

*Reversed and final decree.*

The appellee, the Norton Coal Company, a corporation, as lessee, holds certain rights in and upon certain tracts of land, aggregating a considerable acreage, in Wise county, under certain leases in writing acquired by or made directly to the appellee from appellant, Charles F. Hagan, trustee, or from Patrick Hagan, the predecessor in title of appellants, which leases, unless forfeited by non-compliance with some of the provisions thereof, will run until May 1, 1939, and may run for twenty years thereafter, if the appellee or its successors shall exercise the right which they have to renew the same for that further length of time. The leases mentioned were duly recorded before the controversy in this suit arose.

The appellants own said land in fee subject to the rights of the appellee, aforesaid, and also own the right to receive the rent and royalty and the other rights of the lessor under the aforesaid leases.

A short time prior to the institution of this suit the appellant, the Hagan Company, Inc., advertised, in substance, that it would sell at auction at a time and place named, all of the rights of the appellants in said land, and (as the evidence as a whole indicates, though the record is somewhat obscure as to this) all of appellants' rights under the said leases (and also all of their interests in a large quantity of other lands not material to be mentioned), stating in the advertisement that, "Included in the foregoing properties are the lands leased to the Norton Coal Company, the Interstate Coal Company and the John A. Esser Coke Company;" and that "The title to the properties offered are good and a general warranty deed will be given therefor."

The advertisement sets out the land involved in this suit as consisting of eleven parcels, stating the acreage of each parcel, running from 2.17 to 187 acres, respectively; refers in general terms to the great value of it on account of the coal underlying it, and to the value of the surface as farming land. In the latter connection the advertisement contains the following statements:

"Valuable as Farming Land.

"The surface of this land is peculiarly suited to the growth of apples, peaches and grapes. Those who have any doubt of this will be convinced by examining some of the small orchards that have been set out and are now bearing."

"Word to Those Who Purchase Surface Underlaid With Coal and Subject to Lease.

"The law amply protects the surface owner against injuries caused from mining beneath, which rights are

correctly defined by the Supreme Court of Appeals of Virginia in the case of *Big Stone Gap Colliery Co.* v. *Hamilton*, 119 Va. 271 (89 S. E. 305)."

The advertisement also stated in notations on the list of said parcels of land, as to some of them, that the "minerals only" will be sold; that as to other parcels the "minerals fee" will be sold; as to others that the "fee" will be sold; and as to two parcels of the "Nelson Hamilton Tract," that the "mining and unsold surface" will be sold—making no specific mention on such list of the purpose to sell any part of the surface of the A. W. Nash tract, presently to be mentioned.

Thereupon, this suit was instituted by the appellee for the purpose of injoining the said proposed sales.

The bill alleges, in substance, that under the terms of said leases, the appellee is entitled, during the life of the leases, to the exclusive possession and control of all of the surface of the land involved. That, if appellants were allowed to sell the surface in small parcels to various and sundry purchasers, this would violate the rights of the appellee as lessee under said leases, and infringe upon the easements granted to appellee by the same. That, moreover, with the dispute, contention and litigation necessarily involved in the protection of the appellee, in the exercise and enjoyment of its rights to the use of the surface, the appellee will be involved in endless litigation, disputes and controversies over these rights with the numerous purchasers from appellants. That such sales of the surface would imperil the appellee's rights and the quiet enjoyment of them, which is implied in the covenant of the leases, and cast a cloud upon the appellee's title and rights in the premises.

There was a demurrer to the bill, which was overruled.

The answer of the appellants, in substance, denies that the appellee is entitled to the exclusive possession

and control of all of the surface of the land involved; and alleges that there are many acres of the surface of such land to the possession and control of which the appellee is not entitled. That appellant had a portion of the last mentioned surface divided into tracts ranging from one acre to several acres, intending at the sale to offer for sale such separate tracts, and the property as a whole, "reserving at all times the rights of the (appellee) to the property to be conveyed." That the acts and efforts of the appellants towards making the proposed sale advertised as aforesaid were within their legal rights and that they never intended or expected in any way to interfere with any of the rights of the appellee; and that they had not done or threatened to do any act which will interfere in any way with such rights.

There were depositions and documentary evidence filed for both the appellee and appellants and, upon the hearing on the merits, the court below entered the decree under review which provides as follows:

"On consideration thereof, it is adjudged, ordered and decreed that the injunction herein awarded on the 23rd day of October, 1920, as amended by the decree of the court entered herein on October 25, 1920, the latter in the following words and figures:

" 'It is adjudged, ordered and decreed that the defendants, and each of them, their agents, servants and employees, and each and every of them, be and they are hereby enjoined and restrained from selling or offering to sell any of the land, or any part thereof, or interest embraced in the leases or either of them, in the bill set forth and referred to, on October 26th, 28th, 29th, or on either of those dates, or at any time or place, except that the defendant may now or hereafter sell any *reservationary* interest, after the expiration of said leases, that they or either of them have in said land or surface,

but not so as to authorize or allow the purchaser to take possession or exercise- any control whatever over said land or surface, or any part thereof, so long as the said leases remain in force' — be and the same is hereby made perpetual, and that the complainant recover of the defendants its costs herein expended."

The provisions of the several leases under which the appellee claims and holds its rights in controversy in this suit, are, so far as such controversy is concerned, set out in a certain lease, of date April 12, 1894, from Patrick Hagan, lessor, to the Ayers Coal Company, lessee (a predecessor in title of appellee), which provisions, so far as material, are as follows:

First: In consideration of the terms, covenants, conditions and stipulations as hereinafter set forth to be performed and observed by the lessee and lessor, he, the lessor, doth demise, let and lease for coal mining and coal coking purposes only, to the lessee  *  *  *  the following tracts or parcels of coal land situate, lying and being in the county of Wise and State of Virginia, and bounded and described as follows: (Here follow the several descriptions of a number of parcels of land.)

"*  *  *  together with the exclusive privilege of mining and coking coal, and selling and shipping the same on the above described premises during the entire term hereby created, and all renewals thereof and the privilege of using so much of the surface of the land and timber, sand, stone and water thereon and therein as may be necessary or convenient for mining or coking coal, and for the construction or repairing of buildings, roads, railroads, tipples, tramways, bridges, oven and other structures on the premises, reserving thereout nevertheless to the said lessor all the timber growing thereon which may exceed twenty inches in diameter. But lessor hereby reserves a right of way over said land

for a railroad leading to any other coal lands which may be owned by the lessor or his heirs, provided that the said reservation of right of way over the said premises shall not work any damage to the lessee nor abridge the rights and privileges conferred upon it by this lease without full compensation to the lessee for the same.

\* \* \* \* \* \* \* \* \* \*.

"Fifth: The lessee further covenants that he will drive the regular size gangways and airways through such portions of said bed or vein of coal as may prove faulty, or as may not yield merchantable coal, and will leave no available coal in mining, openings or workings than may be necessary and proper for their full security, but will leave pillars and supports of coal along the sides of the gangways and elsewhere as the engineer or the proper officers of the lessor shall consider necessary for such security.

"Sixth: If the lessee, on abandoning any room, working or other opening, shall leave any available coal standing which, in the opinion of the said officer of the lessor, is not necessary to be left for the proper security of the works, the said officer shall give the lessee notice thereof with directions to remove the same, and if the lessee shall refuse to mine and take away said coal, according to the directions of the said officer, for the space of one week after such notice, the said officer and the lessee shall forthwith submit the question whether the coal left is, or is not, necessary as aforesaid, to two arbitrators, one of whom shall be appointed by each of the said parties hereto, respectively, and in case the two then chosen cannot agree the said arbitrators shall appoint a third, and in case of either party hereto neglecting to nominate an arbitrator for the space of ten days after notice from the other party to nominate an arbitrator, the other party shall nominate two, and the two

then appointed shall nominate a third to determine and report whether any, and if any, how much available or merchantable coal, whether lump or slack, has been left, and ought to have been mined and taken away, and unless the lessee shall immediately mine the said coal he shall pay the lessor, within two weeks after such report, the sum of ten cents for every ton of twenty-two hundred and forty pounds of available coal left standing, which, according to the report of said arbitrators or majority of them, ought to have been mined and taken away.

"Seventh: The lessee further covenants that the lessor, his agents, engineers, or other persons on his behalf, with their assistants, shall have the right to enter the said mines at all times, and all other works, whether below or on the surface of the ground, in order to inspect, examine, survey or measure the same or any part thereof, or for any other lawful purpose, to use freely the means of access to the said mines and works without hinderance or molestation.

"Eighth: It is further agreed that the lessee shall employ a competent mining engineer, whose duty it shall be to keep up mine surveys, and give directions and courses of entries, rooms and air courses and *plant* the same on a scale of one thousand feet to the inch, and send a map to the lessor or his chief engineer on or before the thirtieth day of the months of March, June, September and December, showing all mine work done during the three preceding calendar months, and the lessor or his engineer shall have the privilege of keeping the said map long enough to make the necessary copies, and shall at all times have access to the maps, plans, tracings, etc., of the lessee and may take therefrom copies of such portions as he may desire.

"Ninth: It is further agreed that the lessee shall erect

or cause to be erected and operated upon the demised premises, not less than fifty ovens within eighteen months from the first day of May, eighteen hundred and ninety-four.

"Tenth: The lessee covenants and agrees to pay to the lessor the sum of two thousand, five hundred dollars each year of the continuance of this lease, as a minimum rental under this lease, whether the quantity of coal mined or coke manufactured shall produce that amount or not, and as much more yearly as the said royalty on coal actually mined shall exceed the said minimum rental to be paid quarterly as aforesaid, the first instalment of said minimum royalty to be paid on the first day of January, eighteen hundred and ninety-five, and thereafter to be paid every three months. But the lessee, however, shall have the privilege of mining during any succeeding year, free from royalty, a sufficient amount of coal above the rental of such year to reimburse him for the deficiency in any preceding year.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Seventeenth: It is further covenanted and agreed by and between the parties hereto that if the said lessee shall fail or refuse to comply with the terms of this lease, or to keep and perform the covenants and agreements on its part herein stipulated and provided for, the said lessor shall, at his option, after sixty days' notice in writing to the lessee, have the right to re-enter the said demised premises in as full and complete possession as if this lease were fully performed and determined by effluxion of time.   \*   \*   \*"

It appears in evidence that the land mentioned in the answer of appellants as land of which they had had the surface divided into tracts ranging from one to several acres, with a view to offering the surface of such separate tracts for sale, as aforesaid, is known as the A. W.

Nash tract, and is detached from the other lands involved in this suit, and that on such detached tract of land the appellee has not yet begun any mining operations.

With reference to when such operations may be expected to begin the following appears in the testimony for the appellee:

"Q. What is in contemplation with reference to the A. W. Nash tract at the present time on the part of the Norton Coal Company?

"A. On the part of the Norton Coal Company no definite plans have been made for the development of the A. W. Nash tract, although it is our intention in the immediate future to drill that property and see just what is available, the thickness of the seam, etc., and then lay our plans for future development."

It further appears in evidence that, while originally the residue of the land covered by said leases held by the appellee were contiguous, by reason of the result, in 1914, of a certain action of ejectment, one Steinman recovered a verdict and judgment for a certain strip of such land (referred to in the record before us as the Steinman land), running entirely through it, dividing such residue of the land into two parcels, the larger of such two parcels lying on the south side, and the smaller of such two parcels lying on the north side of such Steinman land.

The testimony for appellee is to the effect that the said portion of said land north of the Steinman land will not be mined until after the mining operations have been begun on the A. W. Nash tract.

The testimony for the appellee is also to the effect that when begun and during the mining of the A. W. Nash tract and of the land north of the Steinman land, the use of the whole of the surface of these respective

portions of land will be absolutely necessary for the mining of the coal underlying such land. There is no testimony for the appellants which controverts this.

The testimony for the appellee, without any testimony for appellants controverting it, is further to the effect that the mining operations of appellee are now in progress on the remainder of the land involved in this suit, namely, said portion lying south of the Steinman land. That two veins of coal on this land have been extensively developed. That a third vein of coal was discovered not long before this suit was instituted. That this vein was also being developed at the time the suit was brought. That this will result in very greatly enlarging the coal mining operations of the appellee in the immediate future. That because of the actual situation thus brought about and existing, the use of all of the surface of such land (lying south of the Steinman land), which has not heretofore been sold and conveyed by appellant, Charles F. Hagan, and his father, Patrick Hagan, and perhaps some of such surface holdings, was either reasonably necessary or "convenient" for the mining and coking of coal on such land, from the time the suit was brought until such operations are completed. The evidence specifies in great detail why this is so—at too great length to be stated here.

While the appellant, Charles F. Hagan, testifies, in substance, in his depositions in the case, that there was no purpose in making the proposed sales to induce persons of litigious dispositions to purchase the land and thereby bring upon appellee a multiplicity of litigation in order to protect the rights of appellee; he does not testify that he did not anticipate that that would be the practical result of the proposed sales. And the following letters written by this appellant about a month before the dates advertised for the proposed sales, appear in the record:

"Bristol, Va., August 31, 1920, 11:05 A. M.

"Mr. Robert S. Graham,
     "Norton, Va.

"Dear Bob:

"I have become weary and sick of the 'game.' As a matter of fact, I am beginning to be convinced that I do not know how to play the 'game,' and I have about decided, and in fact all of the interested parties except one have agreed that we sell at public auction all the real estate that we own sometime this fall, and I am convinced that this is the wise thing to do; especially when we are threatened with such tremendous taxation. However, we have not fully decided as to whether or not we will sell the interest in the leases that we purchased at Gate City, but we do feel that we do not want to be bothered and encumbered with the surface.

"Our plans are to pull off one of the biggest auction sales that has ever been in Southwest Virginia.

"Hope you will appreciate my position and will avail yourself of the opportunity to get rich.

"I am sending a copy of this letter to our mutual friends Mr. John Esser, Mr. Webb Willits and Mr. R. B. Alsover.

"I beg to remain,
          "Very sincerely yours,
               "Charles F. Hagan, Trustee."

"Bristol, Va., September 15, 1920, 11:00 A. M.

"Mr. Robert Graham,
     "Norton, Va.

"Dear Robert:

"I intended to call on you Monday, but found that when I got through the business I had to attend to and catch the train, I didn't have the time to call.

"Now, Bob, business is business, and now is the time, if it ever was, to dispose of the property in and around Norton. People are absolutely wild to buy property in that town. I have never seen the equal, and I am going to dispose of all our surfaces, if I possibly can, unless our lessees are willing to permit us to share in their prosperity. My proposition is this: If the lessees of the coal properties that I bought at Gate City are willing to divide their profits with me, I will turn over the surfaces to them with the understanding that I will not sell one foot of it unless they are willing to join in the conveyance, and I want and must have ten per cent. of the price of coal f. o. b. mines. This is one of the most equitable means of sharing alike in both leases and profits. As a matter of fact, the only mineral that does not have a scaling royalty is coal. And as I understand it the large majority of anthracite operations are, and always have been, on a scaling royalty.

"In turning over the surface to the lessees, they are entitled to use it as they please, and therefore must pay all taxes of whatsoever kind that may now or hereafter be assessed against the property. If the coal brings a good price, I get a good royalty; and if coal brings nothing, I get nothing. Could there be anything more fair, more just, more equitable than this? If so I am ignorant of it.

"I have only gone to the expense of having my auctioneer look over the properties and before going to any further expense I want to hear from you, the Norton Coal Company and the Esser Coal Company, and hope you will be kind enough to take the matter up with them as I know you are close to all of them and they have great confidence in you.

"Yours truly,
"Charles F. Hagan, Trustee."

"Bristol, Va., September 21, 1920, 11:00 A. M.

"Mr. Robert Graham,

"Norton, Va.

"Dear Robert:

"There was a delegation of 'furriners' here yesterday waiting to buy all the surface for trucking, orchards and vineyard purposes, that we have in Norton, stating that they had a company that could pay cash for the property and they dared me to set the price per acre. I told them that it was more than likely that the property would be sold at auction within the next thirty days, and asked them why it was they were so anxious to buy now and not wait until the day of the sale at which time they might be able to buy the surface cheaper than I could sell it by the acre. But they could not see it that way. I further told them that I was going to only warrant specially, so I would not hereafter be bothered about the property, and to my great surprise, they really seemed pleased, stating that they would be perfectly satisfied, leaving the impression that they had already thought of this matter, so I was very much puzzled to know their exact anxiety about the property under such conditions. But I happened to run across a native Nortonian this morning who knew me very well, and appeared to be so intimate that I was ashamed to ask him his name, who was present during the conversation and I asked him if he had any idea of what they had up their sleeves. He told me that he understood that these "Assaryans" were being backed by some "Jews," and I asked him what that had to do with it, and why they were so anxious for the property? He had a different construction to put upon their motives.

"He related two instances that might be the key to the situation. One was that a party in Norton (whose name he mentioned, but I do not recall) at one time bought a lot from the Norton Land and Improvement

Company and part of this lot had caved in. He stated that the Norton Coal Company gave him $100.00 to fill in the place with rock and he subsequently sued the Norton Land and Improvement Company and got judgment for $3,500.00. He also referred to a party getting damages of $1,200.00 for the caving in of a pig pen on a lot which originally cost him $300 or $400.

"Now, I do not know if there is anything in the above statement at all, but it seems I do recall that Mr. Willits or someone else mentioned the pig pen proposition some time during the sale at Gate City. If this should be a fact, I can readily see why they would prefer me to warrant specially; by doing this they would hope to get sympathy from a jury from the fact that they would have no other recourse, whereas, if I should warrant generally the jury would know they could come back upon me. But I am not interested in the above proposition more than for fear that Pat might get it into his mind that I made you a bad proposition the other day. I also have a slight suspicion that Mr. Pennington might look at it like Pat, and for fear they might do so, I urge you to immediately give me your decision along with Norton Coal Company and the J. A. Esser Coal Company as to whether they will accept the proposition of paying ten per cent. royalty on each and every ton (of 2000 lbs.) of coal mined from the property. on the prevailing price f. o. b. mines at the time of sale. *

"Now, Bob, we have set the sale for the 26th, 27th, 28th and 29th of October, and I must have the decision of all our lessees immediately because I have to begin preparing the advertisements, if you cannot comply with the above demands and statements. *  *  *

"Hoping to hear from you at once, I beg to remain,

"Yours very truly,
"Charles F. Hagan, Trustee."

It appears, in substance, from the testimony for appellants that if they had not been injoined from making the proposed sales and had sold portions of the surface aforesaid, the deeds of conveyance thereof to the purchasers would have been substantially in the following named form, to-wit:

The deeds would have contained the usual phraseology of a deed conveying land in fee, with general warranty of title, stating the acreage, and containing a description of the land by metes and bounds, or the equivalent, followed by a separate paragraph containing two reservations—the first retaining and reserving to the grantor all mineral, minerals and mineralized substances, coal, oil, gas and other mineral substances, in, on or under the land conveyed, owned or thereafter acquired by the grantor or its predecessors in title, with right of ingress and egress thereto and therefrom—the second stating that "This conveyance is also made subject to the coal mining lease or leases of said property heretofore made by Patrick Hagan" (and Charles F. Hagan, Trustee), "together with such renewals thereof, if any shall be made, which said leases are of record in the clerk's office of Wise county, Va., and to which reference is here made as a part hereof."

The record does not show what forms of deed or deeds of conveyance were contemplated to be made to a purchaser or purchasers of "minerals," or "mining" rights, or of the rights or portions of the rights of appellants under said leases.

Other references to the evidence appear in the opinion.

*Pennington, Price & Jones*, for the appellants.

*E. M. Fulton* and *J. L. Camblos*, for the appellee.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented by the assignments of error will be disposed of in their order as stated below.

[1, 2] 1. To what extent did the proposed sales of surface of land, injoined by the decree under review, threaten to create, and to what extent would the execution and delivery of the deeds of conveyance of the form expected to be made in completion of such sales, have created a cloud upon the appellee's title or right to the use of the surface of, and other things on, the land embraced in the leases aforesaid?

In view of the evidence and of the authorities on the subject, we are of opinion that the proposed sales of any portion of the surface of that portion of the land lying south of the Steinman land, threatened to create, and that the conveyance of any portion of such surface by the form of the deeds in question, if made, would have created, a cloud upon the title or right of the appellee in question.

. The evidence shows that the appellee was and is entitled under the provision of its leases, and for the purposes therein specified, to the use of all of the surface of and also to the use of the timber (under the size mentioned) and the sand, stone and water on that portion of the land just mentioned, at and from the time this suit was brought until the operations of appellee under such leases are completed, which may continue for forty years from May 1, 1919.

Deeds of the form mentioned, when executed and delivered, would, as we think, have been understood by the grantees as conveying to them a present right and title to the surface of land (and to the timber, sand, stone and water thereon as appurtenant thereto) therein purported to be conveyed, subject to be terminated for the time being, not at once, but only at some future time by the future coming into and during the existence

of the right of appellee to such surface, etc., or to some
portion thereof, under the leases held by it referred to in
the deeds. And we are of opinion that, on their face,
such would be the proper construction of such deeds,
and that the natural result of such deeds would be the
taking and retention of possession by the grantees
thereunder, unless and until prevented by litigation.
Such deeds, therefore, would not have been void on
their face, but they would have been apparently valid
to convey a present right and title to the surface of the
land, etc., purported to be conveyed thereby. It would
have required extrinsic evidence in the future, other
than the mere production of the leases referred to in
the deeds, to defeat such operation of the deeds;
namely, the production, in separate actions or suits
against the several grantees, of the same character of
extrinsic evidence which has been introduced in the
instant suit, showing that the appellee, at the time such
deeds were made, held, under said leases, the prior right
and title to the use of the surface, etc., purported to be
conveyed by the deeds.

[3] It is well settled that the court below had juris-
diction to injoin the sales in question of any of the sur-
face, etc., mentioned, to the use of which the appellee
was entitled at the time of suit, for the purpose of pre-
venting a threatened cloud upon appellee's right and
title thereto (6 Pomeroy's Eq. Jur. [3rd ed.], sec. 726;
*Pixley* v. *Huggins*, 15 Cal. 127); or for the purpose of
preventing the lessor from violating the covenants of
said leases (5 *Idem*, sec. 286); or in order to prevent a
multiplicity of suits, it being a case falling within the
fourth classification of Pomeroy (1 *Idem*, sec. 255); or
to prevent the disturbance of existing easements (6
*Idem*, sec. 545).

In section 726 of the learned work just quoted, this is
said:

[4] "Sec. 726. Prevention of threatened cloud.—As a court of chancery may undoubtedly entertain a suit to remove an existing cloud upon a title, so also it may, in a proper case, interpose its authority to prevent, by injunction, a threatened act from which such a cloud must necessarily arise. In such cases, however, 'the danger must be imminent and not merely speculative or potential.'" Citing numerous cases, and among them *Pixley* v. *Huggins, supra,* 15 Cal. 127.

In the last named case, in the opinion delivered by Field, C. J., this is said: "The jurisdiction of the court to enjoin a sale of real estate is coextensive with its jurisdiction to set aside and order to be cancelled a deed of such property. It is not necessary for its assertion in the latter case that the deed should be operative, if suffered to remain uncancelled, to pass the title * * * . It is sufficient to call into exercise the jurisdiction of the court that the deed creates a cloud over the title of the plaintiff. As in such case the court will remove the cloud, by directing a cancellation of the deed, so it will interfere to prevent a sale, from which a conveyance creating such cloud would result. (*Petit* v. *Shepherd,* 5 Paige, 501.) And every deed from the same source through which the plaintiff derives his real property must, if valid on its face, necessarily have the effect of creating such cloud upon the title. * * *

"The true test, as we conceive it to be, by which the question, whether a deed would cast a cloud upon the title of the plaintiff, may be determined, is this: Would the owner of the property, in an action of ejectment brought by the adverse party, founded upon the deed, be required to offer evidence to defeat a recovery? If such proof would be necessary, the cloud would exist; if the proof would be unnecessary, no shade would be cast by the presence of the deed. If the action would fall of

its own weight, without proof in rebuttal, no occasion could arise for the equitable interposition of the court; as in the case of a deed void upon its face, or which was the result of proceedings void upon their face, requiring no evidence to disclose their illegality.    *    *    *"

The other grounds of jurisdiction above mentioned are so well settled that we need not quote from the authorities on those subjects cited above.

The application of the authorities which we have cited is not controverted in argument for the appellants as to any surface of the land, etc., to the use of which the appellee was entitled under the provision of the leases giving the appellee such right when "necessary or convenient," for the purposes mentioned in the leases. The issue made by the pleading and the argument of counsel of the appellants on this subject is one of fact; and it is contended on behalf of the appellants, in substance, that the evidence for appellee tends to show that the appellee at the time of suit brought was not entitled, under the provision of the lease just mentioned, to the use of "all of the surface of the land," because the same was not then "needed and never will be needed for the necessary operation of the coal mines;" but no definite position is taken for appellants as to what portion of the surface the evidence for appellee establishes as "necessary or convenient" for the purposes aforesaid.

[5] The evidence on this subject consists entirely of the testimony introduced for appellee. The appellants introduced no testimony whatever on the subject. And the testimony for appellee is very definite and satisfactory with respect to the surface, etc., necessary or convenient for the aforesaid purposes, so far as the portion of the surface of the land lying south of the Steinman land is concerned. It shows that, due to the different and very greatly enlarged plans of operation in

the execution of which the appellee was engaged at the time of suit, determined upon because of the comparatively recent discovery of a third vein of coal underlying the whole of such portion of the land, and to the objections which had been made to the further use of land owned by another corporation for dumping ground, for buildings, etc., etc., theretofore used for such purposes, in connection with the mining and coking operations of appellee on the portion of the land just mentioned, a much larger surface of land is necessary or convenient for appellee's operations than was necessary or convenient before the said discovery of the additional vein of coal. And while it is a subject which admits of debate, after carefully considering the testimony introduced for the appellee with respect thereto, we are of opinion that to the extent of the portion of the surface just mentioned, the evidence is sufficient to show that the time had arrived, when the suit was instituted, when that much of the surface of the land, etc., was "necessary or convenient" for the purposes aforesaid. The great detail of this evidence and its volume makes it impracticable to discuss it in detail in this opinion.

[6-8] In this connection, however, we will add this: "We think that the position taken for appellants, to the effect that the appellee is not entitled (under the provision of the lease giving it the right to the use of "so much of the surface of the land, * * * [etc.] as may be necessary or convenient for mining or coking coal and for the construction and repairing of buildings, roads, railroads, tipples, tramways, bridges, oven and other structures") to any surface, or other things mentioned, unless and until actually "needed," unduly restricts the meaning of the terms used in the leases. Certainly "necessary or convenient" is less restrictive in meaning than if the single-word "necessary" had been

employed. Webster defines "convenient" as meaning "fit, or adapted to an end; suitable; * * * appropriate." We think that the context in which the word "convenient" is found in the said leases limits its meaning so that it cannot be properly construed to embrace every use for which the surface may at any time in the future be convenient; but that it does embrace every use for which the surface, etc., was convenient at the time of suit and would be reasonably necessary in the immediate future following the institution of the suit, in order to carry into execution plans of the appellee already actually made and in process of execution for its mining and coking coal operations under said leases. And it is in the light of this meaning of the word "convenient," as used in the said leases, that we have reached the conclusion we have as to the effect of the testimony on the question under consideration.

[9] It is apparent, however, from the evidence, that it is as yet uncertain and speculative whether the use of the surface of the other lands involved in this suit (to-wit the A. W. Nash tract and the land north of the Steinman land) will ever be "necessary or convenient" for the mining or coking operations of the appellee. Meanwhile the appellants are entitled under said leases to such use of the surface of such other lands as may not, if terminated for the time being when the rights of the appellee accrue and while they exist under such leases, affect the latter rights; and the appellants may lawfully sell and convey such rights belonging to them.

[10] If and when the rights of the appellee, or any of them, accrue as aforesaid, and while they exist, the grounds of jurisdiction above mentioned, for removal of existing cloud upon its right or title, or for preventing the violation of covenants of the leases, or for preventing multiplicity of suits, or disturbance of existing ease-

ments, will afford the appellee ample remedy in one suit against all of the grantees of the surface of the lands, etc., mentioned in the next preceding paragraph, and also against the appellants as to any of such surface, etc., remaining unconveyed away by the latter.

[11] 2. Did the proposed sales of the "mineral" underlying the land involved in suit, and "mining" rights therein, violate the provisions of the leases held by appellee?

The record is obscure with respect to what kind of sales and conveyances were threatened to be made of the "mineral" in question. On the face of the advertisement it appears that such mineral as underlay certain of the respective parcels advertised for sale was proposed to be sold as appurtenant to such respective parcels. Coal is the only mineral disclosed by the record as is supposed to underlie the land. The sale of the mineral underlying the land would, therefore, have been the sale of the coal underlying it, which belonged to appellee or its successors during the life of the leases. Hence such sales and conveyances as advertised would have violated the provisions of the leases aforesaid.

If it was proposed to sell and convey to the purchasers of said respective parcels, as appurtenant thereto, separate interests in the rental and royalty return and in the supervisory rights of the appellants as lessors, that would have violated the provisions of the lease, which, in effect, rendered such rights of the lessors incapable of division into separate and distinct entities. Only the whole or definite undivided interests in such rights of the lessors, to be enjoyed and exercised in common, were capable of being sold in conformity with such rights as they are created and provided for in the leases.

However, the appellants were and are entitled to present and future rights or interests embraced in the leases

mentioned in the next preceding paragraph, such as, for example, to the right to receive the rent or royalty accruing from the leases, and other rights or interests— and they had the right to sell and transfer the whole or definite undivided shares of such interests, to be enjoyed by the purchaser or purchasers during the life of the leases.

[12] It follows from what we have said above that the decree under review is in part erroneous. We will, therefore, under the statute (Code, sec. 6365), enter our decree reversing the decree under review and directing that the defendants and each of them, their agents, servants and employees, and each and every of them, be and they are enjoined and restrained from selling or offering to sell any of the surface of any of the portion of the land in the bill mentioned which lies south of the Steinman land, or any timber growing thereon, except such timber as exceeded twenty inches in diameter as of April 12, 1894, if any there be, or any sand, stone, or water thereon; and from selling or offering to sell any rights growing out of any of the lands involved in this suit and held by appellants as lessors under the leases mentioned in the bill, except as a whole, or in definite undivided shares, to be enjoyed and exercised in common, in pursuance of the provisions of the leases. But such decree will further provide that the appellants may sell or offer for sale as a whole, or in definite undivided shares, to be enjoyed and exercised as just stated, their rights just mentioned held as lessors, growing out of all of the lands in the bill mentioned; may sell or offer for sale, in any way they may choose, any reversionary interest they may have in all or any of the land in suit after the expiration of said leases, but not so as to authorize or allow the purchaser to take possession of or exercise any control whatever over the surface of any

part of the land lying south of the Steinman land, so long as the said leases remain in force, and may sell or offer for sale any or all of the unsold surface of the A. W. Nash tract and of the other land in the bill mentioned which lies north of the Steinman land, provided the conveyance, or conveyances, of such surface to the purchaser, or purchasers, shall, in addition to such reservations as the appellants may make in their own behalf, expressly set out, in substance, that the conveyance, or conveyances, is or are made subject to the coal mining and coking leases of such land held by appellee or its successor, or successors, and such renewals thereof as have been or may be made, which are or may hereafter be recorded in the clerk's office of Wise county, Virginia, with the further express provision that all the rights conveyed shall terminate for the time being if, and when, and to the extent, and during the time, they shall at any time thereafter conflict with the rights of appellee, or its successor or successors, held under said leases, or any renewal of any of them, and that the rights conveyed on the A. W. Nash tract and on the land north of the Steinman land, respectively, shall terminate for the time being, if they have not theretofore been affected as aforesaid, upon the beginning and during the coal mining operations of appellants or their successors under said leases or any renewal of any of them, upon such respective portions of land. Costs will be decreed in favor of appellants.

*Reversed and final decree.*